**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW MEXICO**

ROBERTO BECERRA,

     Plaintiff,

v.                                                  Civ. No. 17-817 GJF

NANCY A. BERRYHILL, *Acting*
*Commissioner of the Social Security*
*Administration*,

     Defendant.

## ORDER

THIS MATTER is before the Court upon Plaintiff Roberto Becerra's ("Plaintiff's") "Motion to Reverse and Remand for a Rehearing with Supporting Memorandum" [ECF No. 16], filed December 8, 2017, and its accompanying "Memorandum in Support of Motion to Reverse and Remand for a Rehearing" ("Motion").[1] ECF No. 17. The Motion is fully briefed. *See* ECF No. 23 (Commissioner's Response); ECF No. 25 (Plaintiff's Reply). Having meticulously reviewed the entire record and the parties' briefing, the Court concludes that the Administrative Law Judge's ("ALJ's") ruling should be **AFFIRMED**. Therefore, and for the further reasons articulated below, the Court will **DENY** Plaintiff's Motion.

## I.    BACKGROUND

Plaintiff was born December 3, 1973. Administrative R. ("AR") 76. Plaintiff previously worked at a warehouse and on an irrigation project. AR 656. He then worked as a casino dealer for several years, and was fired after he could not return to work because of pain following a car accident. AR 43. Plaintiff filed an application for Supplemental Security Income ("SSI") on August 1, 2014, and for disability insurance benefits ("DIB") on October 2, 2014. AR 13. In

---

[1] All citations to Plaintiff's Motion will be to the Memorandum in Support [ECF No. 17], not the Motion itself [ECF No. 16].

both applications, Plaintiff alleged onset of disability beginning October 1, 2005. AR 13. The Social Security Administration ("the SSA") denied Plaintiff's claim initially and on reconsideration. AR 13. Plaintiff then requested a hearing, which was held in front of ALJ Lillian Richter on November 30, 2016. AR 13. Plaintiff testified at the hearing, as did Mary D. Weber, a vocational expert ("VE"). AR 13. Plaintiff was represented by counsel at the hearing [AR 13], but represents himself in the instant appeal.[2]

On March 2, 2017, ALJ Richter issued her decision that with respect to his DIB application, Plaintiff was not disabled from October 1, 2005, through December 31, 2011, which was the date last insured. AR 24. Regarding his SSI application, ALJ Richter concluded that Plaintiff has been disabled since August 1, 2014, the date that the application was filed. AR 24. Plaintiff subsequently asked the SSA's Appeals Council ("AC") to review ALJ Richter's decision with respect to his DIB and SSI applications, but the AC denied his request on June 7, 2017. AR 1. With his request, Plaintiff also submitted to the AC letters he wrote to N. Phoenix Anderson, Ph.D., and David LaCourt, Ph.D., as well as his affidavit and a letter from Gabriel Becerra, his brother. AR 2. The AC found that the evidence did not "show a reasonable probability that it would change the outcome of the decision[,]" and "did not consider and exhibit this evidence." AR 2. As a consequence, the ALJ's decision became the final decision of the Commissioner. 20 C.F.R. § 422.210(a) (2018). Plaintiff timely filed his appeal in this Court on August 10, 2017. ECF No. 1.

---

[2] "The Supreme Court has directed courts to hold pro se litigants' pleadings 'to less stringent standards than formal pleadings drafted by lawyers.'" *Tatten v. City & Cty. of Denver*, 730 F. App'x 620, 623 (10th Cir. 2018) (unpublished) (quoting *Haines v. Kerner*, 404 U.S. 519, 520 (1972)). The Tenth Circuit "has stated that liberal construction of pro se pleadings 'means that if the court can reasonably read the pleadings to state a valid claim on which the plaintiff could prevail, it should do so despite the plaintiff's failure to cite proper legal authority, his confusion of various legal theories, his poor syntax and sentence construction, or his unfamiliarity with pleading requirements.'" *U.S. v. $9,020.00 in U.S. Currency*, 30 F. App'x 855, 858 (10th Cir. 2002) (unpublished) (quoting *Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991)). In issuing this Order, the Court has liberally construed Plaintiff's filings, but also notes that they are among *the best* pro se filings the Court has ever reviewed.

## II.    PLAINTIFF'S CLAIMS

Plaintiff advances three primary[3] claims of legal error.  First, he argues that the ALJ erred by inferring, without requesting assistance from a medical advisor, that the onset date of his disability was February 2, 2014.  Pl.'s Mot. 6-23, ECF No. 17.  Next, Plaintiff asserts that the VE's testimony is not supported by substantial evidence because the ALJ did not include all of Plaintiff's impairments in her hypothetical question to the VE.  *Id.* at 18.  Finally, Plaintiff alleges that the AC erred by refusing to review the evidence he submitted to it following the hearing, by not requesting that an expert review that evidence, and by not entering that evidence into the AR.  *Id.* at 24-25.

## III.    APPLICABLE LAW

### A.    Standard of Review

When the Appeals Council denies a claimant's request for review, the ALJ's decision becomes the final decision of the agency.[4]  The Court's review of that final agency decision is both factual and legal.  *See Maes v. Astrue*, 522 F.3d 1093, 1096 (10th Cir. 2008) (citing *Hamilton v. Sec'y of Health & Human Servs.*, 961 F.2d 1495, 1497-98 (10th Cir. 1992)) ("The standard of review in a social security appeal is whether the correct legal standards were applied and whether the decision is supported by substantial evidence.")

The factual findings at the administrative level are conclusive "if supported by substantial evidence." 42 U.S.C. § 405(g) (2012).  "Substantial evidence is such relevant evidence as a

---

[3] As detailed *infra*, Plaintiff also makes numerous corollary arguments that relate to - and that the Court considers components of - these primary arguments.

[4] A court's review is limited to the Commissioner's final decision, 42 U.S.C. § 405(g) (2012), which generally is the ALJ's decision, not the Appeals Council's denial of review.  20 C.F.R. § 404.981 (2018); *O'Dell v. Shalala*, 44 F.3d 855, 858 (10th Cir. 1994).

reasonable mind might accept as adequate to support a conclusion." *Langley v. Barnhart*, 373 F.3d 1116, 1118 (10th Cir. 2004); *Hamlin v. Barnhart*, 365 F.3d 1208, 1214 (10th Cir. 2004); *Doyal v. Barnhart*, 331 F.3d 758, 760 (10th Cir. 2003). An ALJ's decision "is not based on substantial evidence if it is overwhelmed by other evidence in the record or if there is a mere scintilla of evidence supporting it." *Langley*, 373 F.3d at 1118; *Hamlin*, 365 F.3d at 1214. Substantial evidence does not, however, require a preponderance of the evidence. *See Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007) (citing *Zoltanski v. F.A.A.*, 372 F.3d 1195, 1200 (10th Cir. 2004)). A court should meticulously review the entire record but should neither re-weigh the evidence nor substitute its judgment for that of the Commissioner. *Langley*, 373 F.3d at 1118; *Hamlin*, 365 F.3d at 1214.

As for the review of the ALJ's legal decisions, the Court reviews "whether the ALJ followed the specific rules of law that must be followed in weighing particular types of evidence in disability cases." *Lax*, 489 F.3d at 1084. The Court may reverse and remand if the ALJ failed "to apply the correct legal standards, or to show . . . that she has done so." *Winfrey v. Chater*, 92 F.3d 1017, 1019 (10th Cir. 1996).

Ultimately, if substantial evidence supports the ALJ's findings and the correct legal standards were applied, the Commissioner's decision stands and the plaintiff is not entitled to relief. *Langley*, 373 F.3d at 1118; *Hamlin*, 365 F.3d at 1214, *Doyal*, 331 F.3d at 760.

### B.     Sequential Evaluation Process

The SSA has devised a five-step sequential evaluation process to determine disability. *See Barnhart v. Thomas*, 540 U.S. 20, 24 (2003); 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4) (2018). At the first three steps, the ALJ considers the claimant's current work activity, the medical severity of the claimant's impairments, and the requirements of the Listing of Impairments. *See*

20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4), & Pt. 404, Subpt. P, App'x 1. If a claimant's impairments are not equal to one of those in the Listing of Impairments, then the ALJ proceeds to the first of three phases of step four and determines the claimant's residual functional capacity ("RFC"). *See Winfrey*, 92 F.3d at 1023; 20 C.F.R. §§ 404.1520(e), 416.920(e). In phase two, the ALJ determines the physical and mental demands of the claimant's past relevant work, and in the third phase, compares the claimant's RFC with the functional requirements of his past relevant work to determine if the claimant is still capable of performing his past work. *See Winfrey*, 92 F.3d at 1023; 20 C.F.R. §§ 404.1520(f), 416.920(f). If a claimant is not prevented from performing his past work, then he is not disabled. 20 C.F.R. §§ 404.1520(f), 416.920(f). The claimant bears the burden of proof on the question of disability for the first four steps, and then the burden of proof shifts to the Commissioner at step five. *See Bowen v. Yuckert*, 482 U.S. 137, 146 (1987); *Talbot v. Heckler*, 814 F.2d 1456, 1460 (10th Cir. 1987).

If the claimant cannot return to his or her past work, then the Commissioner must show at the fifth step that the claimant is nonetheless capable of performing other jobs existing in significant numbers in the national economy. *See Thomas*, 540 U.S. at 24-25; *see also Williams v. Bowen*, 844 F.2d 748, 750-51 (10th Cir. 1988) (discussing the five-step sequential evaluation process in detail).

## IV.  THE ALJ'S DECISION

At step one, the ALJ found that Plaintiff met the insured status requirements of the Social Security Act through December 31, 2011, and had not engaged in substantial gainful activity since the alleged disability onset date of October 1, 2005.[5] AR 14. At step two, the ALJ

---

[5] The SSA's records show that Plaintiff was paid by his employer, Sandia Casino, in 2006. Because Plaintiff earned $5,971.48 that year [AR 234], which was after Plaintiff was in a car accident, the ALJ likely concluded that it was not substantial gainful activity. *See* Social Security Administration, "Substantial Gainful Activity", https://www.ssa.gov/oact/cola/sga.html (last accessed Aug. 19, 2018) (stating that a non-blind individual earning

determined that Plaintiff had the following severe impairments: glossopharyngeal neuralgia ("GN"), post-subarachnoid hemorrhage, cranial nerve VII unilateral, persistent depressive disorder, anxiety disorder, post-traumatic stress disorder ("PTSD"), sleep disorder, somatic symptom disorder, severe disruptive mood dysregulation disorder, degenerative disc disease of the cervical spine, and paresthesia of the left upper extremity. AR 15. The ALJ also determined that Plaintiff's tinnitus and seborrheic keratosis were non-severe "because they do not significantly limit [Plaintiff's] physical or mental abilities to do basic work activities." AR 16. The ALJ found that Plaintiff's allegation of vertigo was not a medically determinable impairment due to a "lack of medical signs or laboratory findings established by medically acceptable clinical or laboratory diagnostic techniques showing the existence of vertigo." AR 16. The ALJ also concluded that since October 1, 2005, Plaintiff "has not had an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments[,]" and used the Psychiatric Review Technique ("PRT") to determine that the severity of Plaintiff's mental impairments "do not meet or medically equal the severity of one of the listed impairments" in listings 12.02, 12.04, and 12.06. AR 16.

At step four, the ALJ determined Plaintiff's RFC as follows:

After careful consideration of the entire record, I find that prior to February 3, 2014, the date [Plaintiff] became disabled, [Plaintiff] had the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b). [Plaintiff] could lift, carry, push and pull 20 pounds occasionally and 10 pounds frequently. [Plaintiff] could stand/and or walk for 6 hours in an 8-hour workday; and sit for up to 6 hours in an 8-hour workday. [Plaintiff] could never balance[,] climb ladders, ropes and or scaffolds. [Plaintiff] should avoid exposure to unprotected heights and hazardous machinery. [Plaintiff] could frequently reach in all directions bilaterally, and could frequently handle[,] finger[,] and feel. [Plaintiff] was limited to simple[,] routine work and could have occasional interaction with supervisors, coworkers and members of the public.

over $860.00 per month in 2006 would ordinarily be engaged in substantial gainful activity). In any event, the parties do not challenge the ALJ's determination regarding substantial gainful activity.

AR 16.  Following February 3, 2014, the ALJ determined Plaintiff's RFC as follows:

> After careful consideration of the entire record, I find that beginning on February
> 3, 2014, [Plaintiff] has the residual functional capacity to perform sedentary work
> as defined in 20 CFR 404.1567(a) and 416.967(a).  Specifically, [Plaintiff] could
> lift, carry, push and pull 10 pounds occasionally and 5 pounds frequently, [and]
> could stand/walk for 2 hours and sit for 6 hours in an 8-hour day. [Plaintiff] can
> never balance or climb ladders, ropes and or scaffolds. [Plaintiff] should avoid
> exposure to unprotected heights and hazardous machinery. [Plaintiff] can
> frequently reach in all directions bilaterally, and can occasionally handle, finger[,]
> and feel. [Plaintiff] is limited to simple[,] routine work and can have occasional
> interaction with supervisors, coworkers[,] and members of the public. [Plaintiff] is
> limited to work that is primarily performed at the workstation. Lastly, [Plaintiff]
> may require frequent and unscheduled breaks throughout the workday, in addition
> to the scheduled work breaks.

AR 19.

In determining Plaintiff's RFCs, the ALJ considered Plaintiff's testimony [AR 42-64],

the extensive medical record, and other non-medical evidence.  AR 16-21.  In evaluating

Plaintiff's credibility, the ALJ concluded that while Plaintiff's "medically determinable

impairments could reasonably be expected to cause the alleged symptoms . . . [Plaintiff's]

statements concerning the intensity, persistence and limiting effects of these symptoms are not

credible prior to February 3, 2014, as [they are] not supported by the substantial evidence of

record."  AR 17.  The ALJ considered the opinions of psychological consultative examiner

("CE") N. Phoenix Anderson, Ph.D. [AR 636-639], psychological CE David LaCourt, Ph.D. [AR

656-661], and state agency disability consultants Charles Friedman, M.D. [AR 76-83, 94-96],

Suzanne Castro, Psy.D. [AR 83, 86-94, 96-98], Joy Kelley, Ph.D. [AR 112, 115-16, 125-27, 129-

31], and James Metcalf, M.D. [AR 114, 125, 128-29].  The ALJ also considered letters from

Augustine Chavez, M.D.[6] [AR 813], Plaintiff's treating physician at First Choice Community

---

[6] Dr. Chavez's letter, dated July 1, 2015, stated that Plaintiff "suffers from [GN] which causes sudden unexpected
severe pain that would distract him from paying attention in an important environment like jury duty.  Please exempt
him from jury duty."  AR 813.  The ALJ gave this letter "significant weight" because "it is generally consistent with

Healthcare, certified Family Nurse Practitioner Lisa Brazil[7] [AR 758], and Bill E. Galbreth,[8] D.M.D. [AR 755].

The ALJ considered records from Eric Thomas, M.D. [AR 341-45], hospital records from Presbyterian Healthcare Services [AR 346-372, 731-62, 769-818], the University of New Mexico Hospital ("UNMH") and University of New Mexico ("UNM") Clinic [AR 373-631, 763-65], New Mexico Orthopedics [AR 641-55, 718-30], Lovelace Medical Center [AR 662-97], and Albuquerque Health Partners [AR 698-717, 766-68]. Finally, with respect to third party function reports, the ALJ considered reports from Plaintiff's brother, Gabriel Becerra [AR 252-62, 319, 336-40], and from Plaintiff's parents, Roberto Becerra [AR 316, 318-19] and Bernadette Becerra [AR 318].

*Dr. N. Phoenix Anderson, Ph.D.*

Dr. Anderson, a psychological CE, evaluated Plaintiff on January 28, 2015. AR 636. The ALJ accorded this opinion great weight because she found it "consistent with [Plaintiff's] abstraction and coping skills on examination, and the other mental health findings, and also consistent with Dr. LaCourt's opinion." AR 20 (internal citations omitted). Dr. Anderson observed that Plaintiff's head had limited movement "due to severe neck pain . . . [i]ntermittently, he places his hand on his right ear and rocks back and forth with his eyes closed;

---

the findings of the psychological consultative examination findings, consistent [with] complaints to his medical providers[,] and [consistent with Plaintiff's] testimony at the hearing." AR 20.

[7] Nurse Practitioner Brazil's letter, dated December 19, 2016, stated that she wrote a prescription for Plaintiff for ear pain on November 11, 2012, and further stated that her clinic could not find records of Plaintiff's visit on that date. AR 758. The ALJ gave this letter "little weight" because "[a]t most, this letter corroborates [Plaintiff's] account of ear pain prior to 2014, but does nothing to educate me on the severity or frequency of the pain." AR 21.

[8] Dr. Galbreth's letter, dated December 19, 2016, stated that he treated Plaintiff "on January 14, 2010[,] for debilitating ear pain. I determined his ear pain may be caused by [t]emporomandibular joint syndrome. He was given a mouth guard for possible alleviation of his pain along with a prescription for 10 [m]g [of] Diazepam. [Plaintiff's] medical record for said care is no longer available." AR 755. The ALJ acknowledged that Dr. Galbreth's letter was "consistent with [Plaintiff's] later report that he had ear pain that was resolved by a mouth guard prescribed by his dentist. Apart from that, the letter does little to assist me in formulating the residual functional capacity prior to February 2014." AR 21.

occurs several times an hour." AR 636. Plaintiff reported that he "thinks about suicide daily but does not want to do it because 'it will kill my mom because she's in bad health. It would break her heart and I can't do that to my family.'" AR 636. Plaintiff stated that his desire to commit suicide is "always on the top of my mind." AR 637. Plaintiff also reported waking during the night because of "ear attacks." AR 636.

Regarding activities of daily living, Plaintiff stated that "he spends most of his day lying down," and his favorite activities were lying down and listening to music. AR 636. Lying down helped his pain. AR 636. Plaintiff's brother did all of the house and yard work, grocery shopping, transporting Plaintiff to appointments, and ran Plaintiff's errands due to Plaintiff's "limited range of motion and severe, intermittent[ ] [e]ar attacks." AR 637. Plaintiff was capable of managing his medication, communicating with others, and "tending to his bedtime routine." AR 637. Plaintiff reported, however, that he showered only once every three days because if water hit his right ear, it would set off an attack. AR 637. Plaintiff also stated that he experienced vertigo. AR 637. Plaintiff stated that his relationship with his parents has always been excellent, and he also has a good relationship with his brother. AR 636. Plaintiff lived with his brother. AR 636.

With respect to Plaintiff's mental health, he told Dr. Anderson that he "gets confused easily, has memory problems, anxiety attacks, fears that people will judge him . . . [and] fears leaving the house due to attacks, which cause him to rock back and forth." AR 637. Plaintiff also felt that he is "mentally slower than others." AR 637. Plaintiff admitted that he never received mental health care, stating that "he does not see how mental health services can help relieve his pain." Plaintiff denied ever being diagnosed with a mental illness, did not take

psychotropic medications, had never engaged in self-harm, and denied attempting suicide. AR 637.

Dr. Anderson opined that Plaintiff "was able to provide historical detail and dates regarding his past experiences," and thus was a credible, reliable historian. AR 637. Plaintiff was able to recall three out of four words after a five minute delay, and Dr. Anderson concluded that his long term memory was intact. AR 637. Dr. Anderson also concluded that Plaintiff's mood was "dysthymic [and] blunted," and opined that "[s]hould his mother pass, it is highly likely that [Plaintiff] will commit suicide." AR 638. Dr. Anderson further found Plaintiff to have an average fund of knowledge, average intelligence, fair judgment, and normal decision making. AR 638. Plaintiff's coping ability, however, was exhausted. AR 638.

Dr. Anderson ultimately diagnosed Plaintiff with mood disorder due to GN, anxiety disorder due to GN, PTSD, sleep disorder (insomnia) due to GN, and concluded that despite his daily suicidal ideation, Plaintiff had a Global Assessment of Functioning score of 70.[9] Dr. Anderson further opined that Plaintiff's "mood disturbance appears to be the direct physiological consequence of a chronic medical condition and not a primary mood disorder[,]" and noted that Plaintiff's daily suicidal ideation "does not seem to be correlated with the impaired judgment of a person experiencing major depressive disorder." AR 638. "Instead, [Plaintiff, who is] of sound mind, has determined that death would be the best alternative to living a life with severe, possibly degenerative pain. Throughout the session, and in the waiting room, [Plaintiff] would freeze, close his eyes, grab his right ear, and rock. His face was flushed and each episode would last for at least one minute." AR 638. Plaintiff described these painful episodes as ear attacks

---

[9] The Global Assessment of Functioning test is "widely used for scoring the severity of illness in psychiatry." See https://www.ncbi.nlm.nih.gov/pmc/articles/PMC2880316/#B14 (last visited August 13, 2018). A GAF score of 70 indicates "some mild symptoms (e.g. depressed mood and mild insomnia) or some difficulty in social, occupational, or school functioning . . . but generally functioning pretty well, has some meaningful interpersonal relationships." See https://msu.edu/course/sw/840/stocks/pack/axisv.pdf (last visited August 19, 2018).

and stated that it was "the most severe, excruciating pain he could imagine anyone could experience. He also elaborated that it occurs throughout the 24 hour day with no respite." AR 638.

Regarding Plaintiff's vocational abilities, Dr. Anderson concluded that although there were "no mental health issues that directly impair [Plaintiff's] vocational abilities[,]" or cognitive issues that "negatively impact his vocational abilities[,]" "the mental fatigue and exhaustion he experiences from his alleged medical condition would lend him unable to work [*sic*]." AR 638. Dr. Anderson further found that Plaintiff had the following limitations: moderate impairment in the ability to carry out simple instructions, and marked impairments in: (1) the ability to understand and remember complex instructions, (2) the ability to make judgments on complex, work-related decisions, (3) the ability to interact appropriately with the public, (4) the ability to respond appropriately to usual work situations, and (5) the ability to respond appropriately to changes in a routine setting.[10] AR 639.

*Dr. David LaCourt, Ph.D.*

Dr. LaCourt, a psychological CE, evaluated Plaintiff on November 1, 2016. AR 656. Plaintiff was referred to Dr. LaCourt by the New Mexico Disability Determination Services ("DDS"). AR 656. The ALJ accorded his opinion great weight because it is "based on his finding on mental status examination, and consistent with" Dr. Anderson's opinion. AR 20. Dr. LaCourt interviewed Plaintiff and reviewed "available background materials," which included "a prior psychological evaluation performed for the DDS[.]" AR 656. Dr. LaCourt noted that Dr. Anderson's observations concerning Plaintiff's "apparent severe pain," including that Plaintiff

---

[10] Dr. Anderson also found that Plaintiff was mildly impaired in ability to make judgments on simple work-related decisions, ability to interact appropriately with supervisors, and ability to interact appropriately with co-workers. AR 639. Dr. Anderson found that Plaintiff was not impaired in ability to understand and remember simple instructions. AR 639.

closes his eyes, holds his right ear, and rocks back and forth, were also present during his examination of Plaintiff. AR 656.

During Plaintiff's episodes of intense pain, Plaintiff also cursed "repeatedly at this clinician during and after the first such episode, a notable inconsistency potentially relating to the extent of actual incapacity." AR 657. Dr. LaCourt observed "three distinct, measurable episodes" that lasted between 25 to 40 seconds each and "several others with very brief eye closures" lasting one or two seconds. AR 657. Dr. LaCourt noted that each of the three longer episodes started right after he asked Plaintiff a question. AR 657. Plaintiff stated that he typically experienced twenty to thirty episodes an hour, which is "twice what was exhibited today." AR 657. Dr. LaCourt further observed that "the episodes presented as clearly momentarily incapacitating for [Plaintiff]." AR 657.

Regarding sleep, Plaintiff stated that he could not lay on his right side at all, and that listening to music was sometimes helpful, although he continued to experience tinnitus. AR 657. Dr. LaCourt opined that "[r]ecall and memory were somewhat vague about seemingly significant information (such as the date of his last surgery and specifics about his medications)[,]" but Plaintiff nonetheless did not have any "obvious gaps or fillers to his retrieval and relating of sampled events." AR 657. Dr. LaCourt found that Plaintiff's affect was partially appropriate, and his mood was pessimistic and depressed. AR 657. Plaintiff "acknowledged continuing to have self-harm ideation; he denied actually trying to hurt himself and there are no known episodes of attempted self-harm." AR 657. Dr. LaCourt also opined that Plaintiff's fund of general information was somewhat variable but he did not have any serious gaps, and Plaintiff's intellectual functioning was about average, but adversely impacted by his previously diagnosed medical condition. AR 657.

Dr. LaCourt ultimately diagnosed Plaintiff with severe somatic symptom disorder with predominant pain, disruptive mood dysregulation disorder, generalized anxiety disorder, and severe persistent depressive disorder.  AR 658.  Dr. LaCourt identified the following functional, vocational limitations:

> No to mild limitation in:
> Understanding and remembering very short information or instructions
>
> Mild limitation in:
> Adaptation to changes in the workplace
>
> Moderate limitation in:
> Social interaction with supervisor
> Awareness of normal hazards and reacting appropriately to them
>
> Moderate to marked limitation in:
> Social interaction with the public and co-workers
>
> Marked limitation in:
> Understanding and remembering detailed/complex instructions
> Sustained concentration and task persistence for carrying out instructions
> Attending and concentrating
> Working without supervision
> Ability to individually travel

AR 658.

*Dr. Charles Friedman, M.D.*

Dr. Friedman was a consultative non-examining physician with DDS and evaluated Plaintiff's medical records on December 21, 2014.  AR 82.  The ALJ granted "significant weight" to Dr. Friedman's opinion, but noted that she "assessed [Plaintiff] with additional limitations based on his subjective reports, and the medical evidence of record.  Where the residual functional capacity differs from [Dr. Friedman's opinion], those differences [were resolved] in favor of [Plaintiff]."  AR 21.  Dr. Friedman reviewed Dr. Anderson's report, medical records from Presbyterian Healthcare Services, UNM Clinic, and UNMH, Gabriel Becerra's

report, Plaintiff's report, and Plaintiff's pain form. AR 90. With respect to Plaintiff's DIB claim, Dr. Friedman concluded that there was insufficient evidence as of the date last insured ("DLI"), which was December 31, 2011.[11] AR 82. With respect to Plaintiff's SSI claim, Dr. Friedman opined that Plaintiff had a spine disorder, which had primary priority and was severe. AR 92.

Dr. Friedman also made an unfavorable credibility determination, concluding that one or more of Plaintiff's medically determinable impairments could reasonably be expected to produce his pain or other symptoms, but also concluded that Plaintiff's statements about the intensity, persistence, and functionally limiting effects of his symptoms were not substantiated by the objective medical evidence alone. AR 94. Confusingly, however, Dr. Friedman later opined, "[Plaintiff's medically determinable impairments of GN, tinnitus, and cervicalgia] can reasonably be expected to produce the alleged pain and symptoms, and the objective medical evidence alone reasonably substantiates [Plaintiff's] allegations about the intensity, persistence and functionally limiting effects of the symptoms." AR 96.

Dr. Friedman opined that Plaintiff could occasionally lift or carry twenty pounds, frequently lift or carry ten pounds, stand or walk for six hours in an eight hour day, sit for six hours in an eight hour day, and had unlimited ability to push and pull. AR 95. Dr. Friedman found that Plaintiff did not have any postural, manipulative, visual, communicative, or environmental limitations. AR 95. Ultimately, Dr. Friedman concluded that the medical evidence of record supported a light residual functional capacity.[12] AR 96.

*Dr. Suzanne Castro, Psy.D.*

[11] Upon reconsideration, Dr. James Metcalf, M.D., reached the same conclusion. AR 110.

[12] Upon reconsideration, Dr. Metcalf affirmed all of Dr. Friedman's findings and conclusions, stating that there were "[n]o additional allegations or worsening of [symptoms,]" no new medical evidence of record, and no new evidence about activities of daily living. AR 114. Dr. Metcalf stated that Dr. Friedman's rating was still applicable. AR 114.

Dr. Castro was a consultative non-examining physician with DDS, and evaluated Plaintiff's medical records on February 19, 2015. AR 94. The ALJ granted "significant weight" to Dr. Castro's opinion, but noted that she "assessed [Plaintiff] with additional limitations based on his subjective reports, and the medical evidence of record. Where the residual functional capacity differs from [Dr. Castro's opinion], those differences [were resolved] in favor of [Plaintiff]." AR 21. Dr. Castro reviewed Dr. Anderson's report, medical records from Presbyterian Healthcare Services, UNM Clinic, and UNMH, Gabriel Becerra's report, Plaintiff's report, and Plaintiff's pain form. AR 90.

Regarding Plaintiff's DIB application, Dr. Castro noted that there was no medical evidence of record prior to the DLI and therefore the "evidence is insufficient for the DIB portion of the claim."[13] AR 83. Accordingly, Dr. Castro also noted that Plaintiff did not have any medically determinable impairments for DIB purposes. AR 83.

With respect to Plaintiff's SSI application, Dr. Castro opined that Plaintiff suffered from anxiety disorder and affective disorders, both severe. AR 92. Using the PRT, Dr. Castro opined that Plaintiff's disorders did not meet their listings. AR 93. Dr. Castro also opined that Plaintiff had mild restriction of activities of daily living, moderate difficulties in maintaining social functioning, moderate difficulties in maintaining concentration, persistence, or pace, and no repeated episodes of decompensation, each of extended duration.[14] AR 93. Dr. Castro concluded that Plaintiff's "[s]tatements regarding allegations are generally consistent throughout the [medical evidence of record] and are considered credible. Some weight is given to the psych[ological] CE opinions; [h]owever, the marked opinions given for responding to changes

---

[13] Upon reconsideration, Dr. Joy Kelley, Ph.D., reached the same conclusion. AR 111.

[14] Upon reconsideration, Dr. Kelley affirmed these conclusions. AR 111.

and responding appropriately to usual work situations are not consistent with . . . the overall [medical evidence of record]." AR 93-94. Dr. Castro further reflected that Plaintiff "is not in current mental health treatment, has had no psychiatric decompensations of extended duration, has not been referred for mental health treatment, and was given a GAF of 70 by the psych[ological] CE [Dr. Anderson]. [Plaintiff] is not prescribed psychotropic medication at this time. The overall [medical evidence of record] supports no more than moderate limitations."[15] AR 94.

With respect to Plaintiff's mental residual functional capacity, Dr. Castro opined that Plaintiff did not have understanding and memory limitations, but was moderately limited in ability to carry out detailed instructions, ability to maintain attention and concentration for extended periods, ability to work in coordination with or in proximity to others without being distracted by them, and ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. AR 97. Dr. Castro also opined that Plaintiff's ability to interact appropriately with the general public was markedly limited, and that Plaintiff was moderately limited in the following abilities: accepting instructions and responding appropriately to criticism from supervisors, responding appropriately to changes in the work setting, and traveling in unfamiliar places or using public transportation. AR 97-98. Dr. Castro added that "[Plaintiff] is capable of completing simple, routine tasks in a non-public setting without strict production quotas or fast pace. [Plaintiff] is capable of superficial interaction with co-workers and supervisors in a routine work setting." AR 98.

---

[15] Upon reconsideration, Dr. Kelley added only that there were "[n]o additional allegations or worsening of [symptoms]" and opined that Dr. Castro's rating was "still applicable." AR 112.

*Statements of Plaintiff's brother and parents*

Plaintiff's brother, Gabriel Becerra, filled out a third party report form on November 14, 2014. AR 252. He stated that he cooks, cleans, and supports Plaintiff, and that Plaintiff lives with him. AR 252. Mr. Becerra also stated that Plaintiff:

> [I]s basically bedridden. If Roberto makes any sudden movement he can set off an attack. I have seen Roberto shake uncontrollably in pain. He has frequently blacked out which is very scary. His appearance has dramatically changed since 2006. He is unable to exercise or really do anything. . . . He can't do anything because he overheats and blacks out. He can't hear well and gets easily upset for no apparent reason. He needs and depends on me for almost everything.

AR 253. Mr. Becerra also stated that since Plaintiff's neck surgery in 2006:

> [H]e's been deteriorating and is withdrawn and isolated. When my brother got neuralgia, his situation became even worse. It broke my heart and still does to see him deteriorating and withdrawn. Roberto's attacks were extremely hard on him and he was suicidal. He doesn't move much and mostly lies in bed with the radio on. . . . Roberto has memory and concentration problems.

AR 253.

With respect to activities of daily living, Mr. Becerra stated that he helps his brother put shoes and socks on, pick up clothes, cut his hair, sometimes shave, cooks for him, sometimes helps him use the toilet, and observed that Plaintiff has blacked out while showering. AR 254. Mr. Becerra also stated that Plaintiff's hands go numb at times, which inhibits his ability to cook. AR 255. Mr. Becerra also does Plaintiff's laundry and shops for him because he is "basically in bed all day." AR 255, 257. Plaintiff "goes out only to get his medication from the pharmacy which is once a month." AR 255. Plaintiff cannot drive. AR 255. Plaintiff's only hobbies were lying down to control his pain. AR 257.

Plaintiff's father, Roberto Becerra, called the SSA on September 8, 2016, and requested that Plaintiff's hearing be expedited because Plaintiff was suicidal. AR 316. The person who took the call stated that "Mr. Becerra was very distraught and frustrated. He was very concerned

about his son and what he might do." AR 316.  On September 9, 2016, Plaintiff's parents and brother submitted a letter to the SSA that stated that Plaintiff was "suicidal and depressed about his case." AR 318.  The same day the letter was submitted, Roberto Becerra called the SSA to ask if it had received the letter.  He then turned the phone over to Plaintiff's brother, Gabriel Becerra, who said "his brother has a phobia of doctors, and will not go to doctors." AR 319. The SSA employee who answered the telephone told Gabriel that "without any medical diagnosis regarding mental issues in the file it would be difficult to expedite a hearing.  The call ended with the brother understanding that a supervisor would review the file." AR 319.  The SSA employee then called Gabriel back and stated that "even if his brother wouldn't seek medical attention, maybe they should call the suicide hotline and ask for advice themselves.  He told me that it was personal with his brother, he is his care taker and he had researched the situation and he knows what to do." AR 319.

Gabriel Becerra swore an affidavit after the hearing that was submitted to the ALJ.  Mr. Becerra stated that he witnessed firsthand his brother's health experiences and his medical attention since October 2015.  AR 336.  Mr. Becerra was present for all of Plaintiff's medical evaluations and examinations since October 2005, when Plaintiff was involved in a car accident with an eighteen-wheeler truck.  AR 336.  Regarding Plaintiff's ear pain, Mr. Becerra stated that he took Plaintiff to Dr. Matthew L. Rounseville for his ear pain on January 29, 2007, and Dr. Rounseville diagnosed Plaintiff with an ear infection.  AR 337.  Mr. Becerra then recounted that he recalled Plaintiff losing consciousness (while his eyes were still open) due to his severe ear pain on or about September 11, 2009.  AR 337.  After this, Mr. Becerra took Plaintiff back to Dr. Rounseville to be treated for his severe ear pain, and on this second occasion, Dr. Rounseville again diagnosed Plaintiff with an ear infection.  AR 337.

Mr. Becerra stated that Plaintiff lost consciousness again on October 15, 2009, and started mentioning suicide. AR 337. Thereafter, Mr. Becerra took Plaintiff to Dr. Rounseville's office again, and on November 16, 2009 (now on the third occasion) Dr. Rounseville insisted that the issue was an ear infection, and first prescribed ear drops that did not alleviate the pain, and then prescribed a different medication for an ear infection. AR 337-38. Mr. Becerra took Plaintiff to see Dr. George Neal, an Ear, Nose, and Throat ("ENT") specialist, on January 5, 2010, who stated that Plaintiff should see the surgeon who operated on his neck and also see a dentist because his ear pain might be caused by temporomandibular joint syndrome. AR 338. The same day, Plaintiff and Mr. Becerra discovered that one of his neck surgeons was no longer practicing medicine, and the other had died in 2008. AR 338.

Mr. Becerra took Plaintiff to see a dentist, Dr. Bill Galbreth, on January 14, 2010, who stated that Plaintiff's ear pain was likely caused by temporomandibular joint syndrome, prescribed Diazepam, which did not improve Plaintiff's pain, and stated that a mouth guard might help. Mr. Becerra then stated that "my brother desperately used the mouth guard for about eight months hoping it would cure his right ear pain, but it did not." AR 338-39.

Regarding Plaintiff's mental health, Mr. Becerra stated that Plaintiff had been suicidal since late 2009, was in constant pain, and had been bedridden. AR 339. He also stated that he and his family "fear [Plaintiff] is going to commit suicide. We do our best to console, discourage[,] and discuss with him the consequences if he were to kill himself and how it would devastate our family because we love him dearly and with all our hearts." AR 339. Mr. Becerra also described his and Plaintiff's efforts to obtain some of Plaintiff's medical records, but that he could not obtain Plaintiff's records from his neck surgeons and Dr. Rounseville. AR 339-40.

*Plaintiff's testimony*

Plaintiff testified that he worked for several years as a casino dealer, which involved primarily dealing cards. AR 42-43. Plaintiff testified that he was terminated from that job because of his neck pain, back pain, and his arms. AR 43, 55. Plaintiff's arms sometimes went numb, which resulted in inability to hold some objects. AR 43. Plaintiff was involved in a car accident in which an eighteen wheel semi-truck hit his vehicle on the driver's side.[16] AR 43. Following the accident, Plaintiff had surgery for a cervical neck fusion in April 2006. AR 43, 56. At the time of the hearing, Plaintiff still suffered neck pain and problems with his arms and back as a result of the surgery. AR 43-44.

Plaintiff first started suffering ear pain in 2007, which progressively became worse. AR 44. Plaintiff did not seek treatment for the ear pain until 2009 when he "blacked out." AR 44. Plaintiff was first diagnosed with GN in January 2010 by Dr. Neal, but Plaintiff insisted that Dr. Neal never told him he had GN. AR 44. Instead, Plaintiff testified that Dr. Neal told him his pain might be related to his neck surgery. AR 44. Other health care providers diagnosed Plaintiff with ear infections and temporomandibular joint syndrome. AR 45. They prescribed antibiotics to address what was thought to be ear infections, and a dentist prescribed a mouth guard. AR 45. Plaintiff insisted that none of the treatments resolved or helped his symptoms.[17] AR 45.

---

[16] There are different dates given by Plaintiff for this car accident throughout the record. Indeed, Plaintiff argues in his Motion that because he told a physician his accident occurred in 2007 [AR 511], rather than October 25, 2005, when it actually occurred, his statement is proof that he suffers from understanding and memory limitations and that the onset date of disability is ambiguous. Pl.'s Mot. 7-8, ECF No. 17. Plaintiff did not testify about when his accident occurred. *See* AR 43. His billing records reflect that he was transported to Presbyterian Hospital by ambulance on October 25, 2005. AR 353. Unfortunately, there are no medical records documenting his treatment immediately following the accident.

[17] Dr. Blanchard, from UNMH, reported that Plaintiff told her in 2012 that the mouth guard would typically provide "complete relief" of his ear pain within twenty-four to forty-eight hours. AR 506.

Plaintiff described the pain he experienced from GN "like someone's shocking me in my ear, stabbing in my ear. I get pain, electricity. Like electric pain that goes down my right side here by my head and down my neck. It's on my right side of my ear." AR 45-46. The attacks are random, and the pain is so bad that Plaintiff blacks out. AR 53. In terms of self-treatment of the pain, Plaintiff testified that he "mostly lay[s] down," which was "all I could do because I wasn't properly diagnosed." AR 46. Plaintiff testified that the only thing that really helped the GN pain is laying down. AR 54. Plaintiff also used a massager to help alleviate his pain. AR 46. Plaintiff could not lift anything weighing more than five pounds because it would trigger an attack of GN pain. AR 54. Any physical exertion, speaking, and sometimes swallowing triggered an attack. AR 55.

Plaintiff was formally diagnosed with GN a second time in 2012, and was prescribed a series of medications. AR 46. Again, Plaintiff insisted that these medications did not alleviate his symptoms.[18] AR 46. In 2014, Plaintiff decided to have nerve decompression surgery to try to alleviate his pain. AR 46. The surgery helped by lessening the duration of his attacks, although Plaintiff still suffered pain from GN. AR 46. Plaintiff testified that after surgery, he suffered attacks twenty or more times an hour, and typically an episode lasted three to four minutes. AR 46. These attacks occurred every day, twenty-four hours a day. AR 46. Plaintiff also developed tinnitus after his surgery. AR 46.

Additionally, Plaintiff's neck pain became progressively worse following his cervical neck fusion surgery. AR 48. Plaintiff suffered a stabbing pain in his neck, lower back, upper

---

[18] Again, this statement is at odds with several statements Plaintiff made to different health care providers. For example, on November 14, 2012, Plaintiff told his physicians that carbamazepine improved his pain. AR 388. Plaintiff reported on November 21, 2012, that he still had "uncontrollable pain when he swallows water with his pills." AR 394. A neurology physician from UNM reported on January 10, 2013, that Plaintiff's symptoms had improved prior to November 2012 when he used a mouth guard. AR 478. After Plaintiff started taking Tegretol in November 2012, his muscle spasms significantly improved, which had previously contributed to fifty percent of his pain. AR 478. Plaintiff also told a physician on January 24, 2013, that Tegretol "significantly improved his right neck spasm" and that Gabapentin "significantly controlled his right inner ear pain." AR 424.

back, and his shoulders. AR 49. Plaintiff also suffered occasional numbness in his arms, and his left arm tingled, which impacted his ability to manipulate objects. AR 49. Plaintiff testified that he could not work, could not do anything athletic, and that it was difficult to turn his neck from side to side. AR 50. Plaintiff also could not reach with his arms over his head due to pain in his neck and shoulders. AR 50.

Plaintiff also testified that he had difficulty sleeping due to attacks, and that he had been awake the entire night before the hearing. AR 51. Plaintiff further testified that he was suicidal and thought about it daily, but the only reason he had not committed suicide was because of his mother. AR 53. He was suicidal because of his pain. AR 53. Further, Plaintiff's brother did everything for him, including caring for him, feeding him, and clothing him. AR 54.

In response to questioning from the ALJ, Plaintiff asserted that various statements in his medical records were inaccurate. AR 57. The ALJ highlighted a statement from a medical record that following his neck surgery, Plaintiff stated that he was feeling well and his activity level had returned to normal. AR 57. Plaintiff insisted that was not accurate. AR 57. Regarding Plaintiff's treatment at UNMH in 2012, the ALJ asked Plaintiff about his statement that his ear had been hurting him for eight to fourteen days. AR 59. Plaintiff responded, "I don't know what the person wrote, but I never would have told them that. I was just sick for a long time and I told them I've been sick since 2007. That would have been accurate for them to put down." AR 59.

The ALJ also questioned Plaintiff about periods of time during which he did not have medical treatment. The ALJ asked whether Plaintiff sought medical treatment for his neck pain between 2006 and 2009, and Plaintiff stated that he had with his primary care physician, Dr. Rounseville. AR 57. The ALJ noted that she did not have any medical records to corroborate

Plaintiff's testimony, and Plaintiff stated that Dr. Rounseville had retired, and he could not get those records because the office had closed down. AR 57. Plaintiff confirmed that he had received treatment for abdominal pain and an upset stomach in 2009. AR 57.

The ALJ again pointed out that she did not see any records for medical treatment for Plaintiff's GN from 2010 to 2012, and Plaintiff stated he had been treated during that time period by Dr. Rounseville. AR 58. Plaintiff testified that Dr. Rounseville continually told Plaintiff that he had an ear infection. AR 58. The ALJ asked Plaintiff whether he ever thought about trying to see someone else for the ear pain if the treatment was not helping him, and Plaintiff responded, "Well, he's been my family doctor for so long, I always relied on him." AR 58.

The ALJ also asked Plaintiff about his statements to health care providers that he was a professional artist. AR 59. Plaintiff stated that the reason he said that was because a woman at UNMH told him that the hospital would work with him on his payments for his medical bills if he said that he was employed, even though he was not employed at the time. AR 59. Plaintiff elaborated, "The girl suggested that – I put down that I was unemployed and she put down – if you don't put down you're employed, they're not going to work with you. But, if you put that you work, they'll work with you to make payments. So that's why I did that." AR 59. Plaintiff confirmed that he was never employed as an artist, and that he could not paint after his neck injury. AR 60.

The ALJ asked Plaintiff about a medical record that stated that Plaintiff had a stiff neck, but was fully functional since his surgery. AR 60. Plaintiff responded, "I don't think I would have gone to a doctor for my neck. I would have gone for my ear, so I don't know why he would have put that down. He or she." AR 60. The ALJ asked Plaintiff whether the statement in the medical record was inaccurate, and Plaintiff stated that it was because he "wouldn't have gone to

the hospital for my neck.  I would have gone for my – the only time I went to UNM was for my – ear."  AR 60.  Plaintiff clarified, "I did have neck surgery, but I never – I don't think I ever said that I was fully functional.  I don't recall doing any tests for that."  AR 61.

## V.    ANALYSIS

The parties agree that Plaintiff is disabled.  They disagree, however, on when Plaintiff's disability began.  The ALJ found that the onset date of Plaintiff's disability was February 3, 2014; Plaintiff contends that the onset date was much earlier, on December 20, 2009, when Plaintiff "received hospital treatment for attempting to commit suicide by poisoning himself." Pl.'s Mot. 4.  Because the medical evidence of record shows that Plaintiff consistently sought treatment for GN and provides enough information that there is no ambiguity, the ALJ did not err in inferring the onset date of Plaintiff's disability herself without assistance from a medical advisor.  Further, the disability onset date of February 3, 2014, is not arbitrary.

Plaintiff's argument that the VE's testimony was not supported by substantial evidence is also unavailing, in part because the VE testified that Plaintiff's need for frequent, unscheduled breaks in addition to regular breaks would disqualify Plaintiff from employment, so it is irrelevant that the ALJ did not include Plaintiff's chronic mental fatigue, sleep disorder, and insomnia in her hypothetical questions to the ALJ.  *See* Pl.'s Mot. 18-19.  The VE's testimony did not assist the ALJ in inferring Plaintiff's disability onset date, *see id.* at 18, therefore the Court rejects Plaintiff's argument that if those impairments had been included in the ALJ's hypothetical questions to the VE, the ALJ would have found that Plaintiff was unable to work prior to December 31, 2011.  *See id.*  Finally, Plaintiff does not explain how the additional evidence he submitted to the AC after the hearing is material, and thus the AC did not err in

refusing to consider it. Therefore, and for the reasons articulated below, the Court concludes that the ALJ's decision should be affirmed.

### A. The ALJ Did Not Err by Determining That Plaintiff's Disability Onset Date Was February 3, 2014.

Plaintiff asserts that the ALJ erred in determining the onset date of Plaintiff's disability and should have obtained assistance from a medical advisor to do so. *See* Pl.'s Mot. 6-23. As a component of that argument, Plaintiff contends that he suffers from severe understanding and memory limitations that caused him to give inaccurate statements to his physicians that he was asymptomatic between 2007 and 2012, that his severe ear pain started in 2009, and that he had experienced improvement in his pain with treatment in 2012 and 2013. *Id.* at 6-10. Plaintiff alleges that these understanding and memory limitations created ambiguity in his medical record because of the inaccurate statements, which required the ALJ to obtain the assistance of a medical advisor in inferring Plaintiff's disability onset date. *See id.* at 9. Plaintiff also alleges that the ALJ erred in how she evaluated his statements and those of his brother and parents. *Id.* at 14, 16-19, 22.

The problem for Plaintiff is that his medical record is not ambiguous; his records, combined with his testimony, show that he consistently sought treatment and that treatment produced sufficient documentation for the ALJ to infer the onset date of Plaintiff's disability. What Plaintiff and his family say about his condition from 2007 to 2014 is not consistent with what Plaintiff's health care providers report in their records, especially with respect to the two incidents that Plaintiff now characterizes as suicide attempts, which is not an ambiguity as much as it is a conflict in the evidence that the ALJ had the discretion to resolve in her role as fact-finder. The ALJ followed the applicable law, including regulations and Social Security Rulings ("SSRs"), in concluding that Plaintiff's disability began on February 3, 2014.

1. **The medical evidence of record was not ambiguous, and therefore the ALJ was not required to obtain assistance from a medical advisor in inferring Plaintiff's disability onset date.**

Plaintiff argues that the ALJ erred by failing to comply with SSR 83-20 when she failed to obtain the assistance of a medical advisor to infer Plaintiff's disability onset date. Pl.'s Mot. 6. Plaintiff contends that his "pre-DLI and post-DLI medical records reveal he suffers from understanding and memory limitations as outlined in the following mentally impaired statements Becerra gave to his treating doctors." *Id.* Plaintiff adds that his medical records are ambiguous because of these statements. *Id.*

Plaintiff then identifies several statements he made to his healthcare providers that he now contends are inaccurate and create ambiguity in his medical records. *Id.* at 6-23. The most relevant to this appeal are Plaintiff's statements that he experienced improvement in pain with treatment, Plaintiff's statements that he was relatively symptom-free between 2007 and 2012, and Plaintiff's statement that his pain started in 2009, as opposed to 2007. *Id.* at 6-9. Plaintiff asserts that he made these inaccurate statements because he has suffered years of "chronic insomnia, intense and persistent years of pain, and years of misdiagnosis of his condition." *Id.* at 10. The Commissioner argues that Plaintiff "superimposes his own narrative on the medical evidence and alleges that he was so impaired by his symptoms that he gave inaccurate reports to a host of medical providers, including providers he saw after an alleged suicide attempt on December 20, 2009." Def.'s Resp. 14 (internal citation omitted).

The Commissioner also argues that it is contradictory for Plaintiff to argue that the record is ambiguous, yet also insist that there is a specific onset date of disability that is different from the ALJ's. Def.'s Resp. 11. The Commissioner asserts that the ALJ complied with SSR 83-20 to determine Plaintiff's disability onset, and argues that this case is distinguishable from *Blea v.*

*Barnhart*, 499 F.3d 903, 912 (10th Cir. 2006), which concluded that the plaintiff's medical record was ambiguous with respect to two of his impairments because the evidence "did not clearly document the progression of his impairments, and presented a situation where the ALJ needed to infer an onset date" for both of the plaintiff's disabilities, and thus the ALJ was required to call a medical advisor pursuant to SSR 83-20 to obtain assistance in inferring an onset date. *See* Def.'s Resp. 13-14. The Court agrees with the Commissioner, and concludes that the ALJ was not required to call a medical advisor for assistance in determining Plaintiff's disability onset date because his medical record is not ambiguous.

### a. Relevant law

"The onset date of disability is the first day an individual is disabled as defined in the Act and the regulations." SSR 83-20, 1983 WL 31249, at *1. The ALJ must establish an onset date of disability, and "it is essential that the onset date be correctly established and supported by the evidence." *Id.* To be eligible for disability insurance benefits, a claimant must prove that she is disabled during the period she is still insured for disability benefits. *Id.* Even so, "the expiration of insured status is not itself a consideration in determining when disability first began."[19] *Id.*

In determining the onset date of disabilities with nontraumatic origins[20], the ALJ must consider several factors: "the applicant's allegations, work history, if any, and the medical and other evidence concerning impairment severity." *Id.* at *2. The ALJ should adopt the onset date alleged by the individual if it is consistent with the all of the available evidence. *Id.* at *3.

---

[19] For DIB purposes, Plaintiff's DLI is December 31, 2011. AR 15. Because the ALJ found Plaintiff's disability onset date to be February 3, 2014, which was after Plaintiff's DLI, the ALJ concluded that Plaintiff was not eligible for DIB. AR 24. Although the expiration of Plaintiff's insured status prior to the disability onset date identified by the ALJ is not a consideration in determining that onset date, it means that without an onset date before December 31, 2011, Plaintiff cannot receive DIB.

[20] The SSA appears to argue that Plaintiff's disability is of non-traumatic origin [*see* Def.'s Resp. 11-12], and Plaintiff does not otherwise address the issue. Lacking argument to the contrary, the Court will evaluate Plaintiff's GN as a disability of non-traumatic origin.

Medical evidence, however, is the most important factor in determining the onset date, and the onset date can never be inconsistent with the medical evidence. *Id.* at *2.

When the medical evidence does not establish a precise onset date, the ALJ may have to "infer the onset date from the medical and other evidence that describe the history and symptomatology of the disease process." *Id.*; *see also Blea v. Barnhart*, 466 F.3d 903, 909 (10th Cir. 2006). "With slowly progressive impairments, it is sometimes impossible to obtain medical evidence establishing the precise date an impairment became disabling." SSR 83-20, 1983 WL 31249, at *2.

> The regulation provides two examples of situations where it may be necessary to infer an onset date: (1) in the case of a slowly progressing impairment, "when, for example, the alleged onset and the date last worked are far in the past and adequate medical records are not available," and (2) when "onset of a disabling impairment(s) occurred some time prior to the date of the first recorded medical examination."

*Blea*, 466 F.3d at 909 (quoting SSR 83-20, 1983 WL 31249, at *3). The onset date selected by the ALJ must have a "legitimate medical basis," *id.*, and a "[c]onvincing rationale must be given for the date selected." SSR 83-20, 1983 WL 31249, at *3.

The Tenth Circuit has held that "where medical evidence of onset is ambiguous, an ALJ is obligated to call upon the services of a medical advisor." *Blea*, 466 F.3d at 911 (internal citations and quotation omitted). "Thus, the issue of whether the ALJ erred by failing to call a medical advisor turns on whether the evidence concerning the onset of [the claimant's] disabilities was ambiguous, or alternatively, whether the medical evidence clearly documented the progression of his conditions." *Id.* at 912. "In the absence of clear evidence documenting the progression of [the claimant's] condition, the ALJ [does] not have the discretion to forgo consultation with a medical advisor." *Id.* at 911–12 (quotation omitted). An ALJ "may not

make negative inferences from an ambiguous record; rather, [he or she] must call a medical advisor pursuant to SSR 83-20." *Id.* at 913.

### b. Clear, unambiguous evidence existed of Plaintiff's disability onset date.

The relevant question here is whether there was clear evidence documenting the progression of Plaintiff's GN. If so, the ALJ had the discretion to forgo consultation with a medical advisor. *Blea*, 466 F.3d at 911-12. If not, the ALJ was required to consult with a medical advisor to determine the onset date of Plaintiff's disability. *See id.* Here, there was clear evidence documenting the progression of Plaintiff's GN, and thus the ALJ did not err in forgoing consultation with a medical advisor.

There are three periods of time in which there are no medical records to document the treatment Plaintiff received: from the original alleged onset date, October 1, 2005,[21] to April 4, 2006, which was the earliest dated medical evidence of record [AR 17, 362]; from May 3, 2006, when Plaintiff had his last follow-up appointment for treatment of complications arising from his neck surgery [AR 365], to October 15, 2009, which was the date of one of Plaintiff's appointments with Dr. Rounseville [AR 744][22]; and from January 14, 2010, when Plaintiff saw Dr. Galbreth and was given a mouth guard and a prescription for Diazepam [AR 755], to November 11, 2012, when Plaintiff presented to the UNMH emergency room ("ER") for his ear pain [AR 403].

---

[21] Again, records indicate that the car accident occurred on October 25, 2005, thus this date appears to be inaccurate, but it is the original onset date alleged by Plaintiff. *See* AR 13 (reflecting that Plaintiff originally alleged October 1, 2005, as the onset date of disability); 353 (billing records showing ambulance transportation and other treatment on October 25, 2005).

[22] There are also records from when Plaintiff appears to have injured his thumb with a knife in July 2008, but neither party discusses these and they do not appear to be relevant to Plaintiff's conditions that caused his disability. *See* AR 367-72.

*Blea* is clear that the ALJ "may not make negative inferences from an ambiguous record; rather, [he or she] must call a medical advisor pursuant to SSR 83-20." 466 F.3d at 913. Plaintiff argues that the ALJ did exactly what she was forbidden to do because she found that there was a lack of information between 2007 and 2012 concerning the intensity of Plaintiff's GN, and then made negative inferences based on the lack of information to conclude that Plaintiff was asymptomatic during that time period. Pl.'s Mot. 12. However, the ALJ did not find that there was a lack of information between 2007 and 2012; the ALJ noted that Plaintiff told his health care provider that he "had been symptom free with respect to his neuralgia from 2007 through October 2012." AR 18. Plaintiff also told several other physicians over different days at UNMH and Lovelace in November 2012 that he usually had an attack every eight months and that using the mouth guard Dr. Galbreth gave him helped the pain [AR 377, 511, 387, 682]. The Court concludes that the ALJ did not err in relying on these statements to conclude that Plaintiff was relatively symptom free from 2007 to 2012. This issue here is not one of lack of information; rather, the issue is that the ALJ relied on the information she had for that time period from Plaintiff, who having realized that his statements are unhelpful for establishing an earlier disability onset date, now attempts to recast them as inaccurate due to impairment from pain.

This case is distinguishable from other cases in which courts have found there to be an ambiguous medical record. In *Blea*, the Tenth Circuit concluded that the plaintiff's medical record was ambiguous with respect to two of his impairments because the evidence "did not clearly document the progression of his impairments, and presented a situation where the ALJ needed to infer an onset date" for both of the plaintiff's disabilities. 466 F.3d at 912. Specifically, with respect to the plaintiff's post-traumatic arthritis, there was a gap in the medical

record for a six month time period, and because an ALJ may not make negative inferences from an ambiguous record, the ALJ was required to call a medical advisor. *Id.* at 913.

Here, Plaintiff's testimony and his brother's statements fill in the gaps for when there are no medical records available. Plaintiff's brother stated that Plaintiff first went to Dr. Rounseville, his primary care physician, for his ear pain in January 2007, and again in September 2009. AR 337. Plaintiff's brother also stated that Plaintiff returned to Dr. Rounseville in October 2009 and November 2009. AR 337. Plaintiff testified that he saw Dr. Rounseville from 2010 to 2012 even though none of his treatment was helping because "he's been my family doctor for so long, I always relied on him." AR 58. Plaintiff also testified that Dr. Rounseville repeatedly diagnosed ear infections and otitis, and repeatedly prescribed medications for those ailments, which Plaintiff accepted and took repeatedly over the course of several years even though they did not improve his GN pain. *See* AR 44-45, 57-58. Plaintiff's medical record, therefore, is not ambiguous, and documents the progression of Plaintiff's impairments.

This case is also distinguishable from *Benson v. Berryhill*, Civ. No. 16-1009 GJF, 2018 WL461093, at *7 (D.N.M. Jan. 18, 2018), in which this Court found that the plaintiff's disability onset date was ambiguous because there was "scant evidence" to "explain the progression of Plaintiff's mental impairments" between the alleged onset date of January 15, 2009, and August 16, 2013, when the plaintiff's primary care physician filled out a medical assessment worksheet that documented numerous marked mental limitations that "affected Plaintiff's ability to perform non-physical work activities." *Benson* is distinguishable because in this case, Plaintiff sought treatment for his GN several times over several years. There was not a lack of evidence for the ALJ to evaluate, despite there not being medical records reflecting Plaintiff's treatment for several years. The ALJ understood that Plaintiff could not obtain those medical records, and

Plaintiff testified regarding the treatment he received during those years. Instead, the ALJ reasoned that due to Plaintiff's statements to his physicians that his pain recurred every eight months prior to 2012, that his use of a mouth guard helped prior to 2012, as well as Plaintiff's statements that his pain improved with medication, his condition was not disabling until February 3, 2014, when it became clear that Plaintiff's GN had worsened and treatment was no longer effective. AR 17-18.

Finally, this case is distinguishable from *Tilla v. Berryhill*, Civ No. 17-93 KK, 2018 WL 2122845, at *6-7 (D.N.M. May 8, 2018). In *Tilla*, "The ALJ did not even cite to SSR 83-20 in his determination. The ALJ did not discuss: (1) his evaluation of the relative weight of Ms. Tilla's alleged onset date; (2) her work history and the day her impairments caused her to stop working; (3) inferences drawn from all of the medical evidence; or (4) how those factors worked together to lead to an inference for the date of onset he determined." *Id.* at *6. The ALJ also "completely ignored significantly probative and relevant evidence in determining Ms. Tilla's onset of disability." *Id.* at *7.

Here, the ALJ clearly utilized the factors from SSR 83-20 to determine Plaintiff's disability onset date, except that she did not explicitly refer to SSR 83-20 in her decision. *See* AR 17-21. The ALJ evaluated Plaintiff's alleged onset date along with his work history, specifically when he stopped working, all of the medical evidence, and how all of that unambiguous evidence supported her inference of the date of disability onset. *See id*. The ALJ explained her determination of the disability onset date thus:

> During a medical visit on February 3, 2014, the treating provider noted that [Plaintiff] had been symptom free with respect to his neuralgia from 2007 through October 2012. Medical records from that point on demonstrate that [Plaintiff's GN] became more troubling. In April 2014, [Plaintiff] underwent [GN] microvascular decompression surgery with limited success. The medical record

of evidence demonstrates that [Plaintiff's] condition has deteriorated since that time.

AR 18.

The record of Plaintiff's appointment on February 3, 2014, states that Plaintiff "first started experiencing symptoms in 2007 which had improved after using a mouth guard. Between 2007 and October 2012 he was symptom free. In October 2012 he started experiencing the symptoms again." AR 414. Plaintiff argues that this physician literally copied and pasted these notes from a physician assistant that Plaintiff saw on July 19, 2013, whose notes are almost identical, and thus the onset date identified by the ALJ is arbitrary, and the ALJ should have called a medical advisor because his statements to these physicians were impaired and inaccurate. Pl.'s Mot. 14; *see* AR 545 (notes from the July 19, 2013, appointment) and AR 414 (notes from the February 3, 2014, appointment).

Ultimately, the Court finds no error in the ALJ's selection of February 3, 2014, as the disability onset date. Prior to that date, Plaintiff sought medical treatment on July 19, 2013, and during that appointment, Plaintiff endorsed a significant improvement in pain since October 2012, which the ALJ noted in her decision. AR 18. By February 3, 2014, Plaintiff reported breakthrough pain at night almost every other day, and by March 27, 2014, his neurologist acknowledged that Plaintiff was "in extreme pain, despite maximum doses of medication[.]" AR 414, 484-85. Plaintiff's Magnetic Resonance Imaging scan on April 4, 2014, showed "a tortuous and long course of the AICA on the right side which could be consistent with compression on cranial nerve 9 as it exits the brainstem in the pontomedullary area." AR 454. By April 10, 2014, Plaintiff reported multiple attacks of pain daily, and stated that his pain had gotten progressively worse over the last two months to the point that it was intractable, severe, and

completely debilitating. AR 481. On April 29, 2014, Plaintiff underwent surgery to attempt to decompress the cranial nerve 9. AR 375-76. The ALJ discussed all of this evidence. AR 18-19.

The ALJ also did not ignore Plaintiff's testimony, his statements, his brother's statements, or his parent's statements, which Plaintiff argues were probative in determining the disability onset date [*see* Pl.'s Mot. 14, 22]; she just accorded them less weight because she did not think they were consistent with the medical evidence of record from prior to February 3, 2014. *See id.* at 17-20. To be sure, the medical evidence of record shows that Plaintiff suffered GN pain before the date of disability, but did not show that he was disabled because of it until February 3, 2014. *See id*.

The ALJ's determination that Plaintiff's disability started on February 3, 2014, was not arbitrary, but rather, was supported by substantial evidence. The ALJ followed SSR 83-20 in determining the onset date of Plaintiff's disability, and accordingly, the Court concludes that the ALJ did not err.

### c. The record refutes Plaintiff's claims of memory impairment and substantiates the ALJ's adverse credibility determination.

There is no medical opinion anywhere in the record indicating that Plaintiff has a memory limitation. In fact, psychological CE Dr. Anderson reported that Plaintiff was a credible and reliable historian because he "was able to provide historical detail and dates regarding his past experiences." AR 637. Psychological CE Dr. LaCourt did report that Plaintiff's "[r]ecall and memory were somewhat vague about seemingly significant information (such as the date of his last surgery and specifics about his medications)[,]" but concluded that "[t]here were no obvious gaps or fillers to his retrieval and relating of sampled events." AR 657.

Dr. Anderson found that Plaintiff was markedly impaired in his ability to understand and remember complex instructions [AR 639], and Dr. LaCourt found the same. AR 658. Dr.

Castro, in contrast, found that Plaintiff did not have understanding and memory limitations. AR 97. Again, there is nothing in the record to indicate that Plaintiff's marked impairment in ability to understand and remember complex instructions translates to understanding and memory limitations that caused Plaintiff to make inaccurate statements to his health care providers. Similarly, there is nothing in the record to indicate that insomnia and pain caused Plaintiff to be an unreliable historian, as opposed to simply not knowing or not remembering the answer to a question posed by a health care provider. In other words, providing an inaccurate answer to a question is *different* from responding, "I don't know," "I don't remember," or "I don't understand the question."

Further, his health care providers' accounts of Plaintiff's own history of his illness are all consistent. On January 5, 2010, Plaintiff told Dr. Neal that he had "a right-sided pain shooting into his ear every time he swallows." AR 699. On November 11, 2012, Plaintiff went to the ER at UNMH, and the physician there noted that "[t]he patient presents with ear pain. The onset was 2 weeks ago. The course/duration of symptoms is constant and worsening. Location: Right ear(s). The character of symptoms is pain. The exacerbating factor is movement. The relieving factor is medications[ ]. Risk factors consist of none. Prior episodes: occasional." AR 403. The next day, on November 12, 2012, Plaintiff told his physicians in the ER at UNMH that he had:

> [A] one to two-week history of severe right ear pain and muscle spasms. Patient has a history of [temporomandibular joint] pain which normally is relieved with using a mouth guard but it has not given him any relief since this right ear pain began to escalate. . . . [T]he pain has been severe and per the patient and his family he has been unable to take food or fluid [due] to severe spasms in his throat and on the right side of his head when he tries to eat or drink anything. He was seen in the emergency department on 11 November by Dr. McGrath and diagnosed with otitis externa[.]

AR 397.

On November 13, 2012, Plaintiff related the following detailed history to Dr. Blanchard

at UNMH:

> [O]ver the last 8-14 days [he] has had worsening of a prior, less severe, intermittent issue, which is that of a pain in his deep right ear that radiates into the external neck and anterior throat described as a lancinating, hot poker, sharp pain. This pain is triggered by touching of his right ear and by swallowing, whether that be liquids, solids or saliva and it is triggered by certain movements of the body. In the last 3 days in addition to the pain, he has had a sensation of spasm, tightening in the throat and on the side of the head that he is referring to his muscle spasm but he said is very odd to characterize.
>
> The patient has been relieving his pain at home by using a hand massager; noting if he places the massager on full strength on the side of his head, it alleviates the pain to some degree. He has also been using automatic tooth brush, applying the bristles to the ear canal and that will relieve some of the pain. He has used ibuprofen but he says that he makes no impact on the pain.
>
> For the last 8 days he has chosen not to eat or drink because of the pain induced when he swallows. In addition, he has become very weak and shaky. He has not been able to sleep for days and he called his family to assist him. He was seen in the emergency room on the 11th and given hydrocodone. He continued to be quite debilitated, staying in bed using these vibrators to attempt to control the pain but was beside himself with pain and his family brought him back on the 12th.
>
> The patient states ear pain started 3 years ago, was simply the boring deep pain in the right ear with some degree of radiation to neck and throat but not nearly as severe as it is now. He initially saw an ENT physician whose exam was normal. Within the week of that examination he saw a dentist for biannual cleaning. He relayed his story to the dentist who diagnosed temporal mandibular joint dysfunction and ordered a mouth piece for the patient. The patient states since that time for the last three years approximately every 8 months he would have a bout of right ear pain. He would use the mouth piece and within 24-48 hours would have complete relief. The patient states, however, two weeks ago, the ear pain started and has progressed regardless of his use of the mouth guard. It has now become absolutely debilitating.

AR 506. Also on November 13, 2012, Plaintiff related a similarly detailed history to the ENT

physician who was consulting with Dr. Blanchard:

> Mr. Becerra is a 38-year-old male who complains of right ear and throat pain on and off for 3 years. He states that 5 years ago he was in a car accident necessitating a cervical spine fusion. For the past 3 years he has had neck pain which radiated to his right ear. He states that he usually has this pain when he

swallows and he describes it as sharp or like a muscle spasm. He has not had this pain often but only about every 8 months. He states that when he gets the pain [it] will last for 4-7 days. This episode of the pain has lasted now for 8 days and has been accompanied by spasms which prompted him to come to the Emergency Department. Incidentally, he saw an ear, nose and throat doctor at Lovelace 3 years ago who told him he had a normal ENT exam. He also saw a dentist 3 years ago [who] diagnosed him with temporomandibular joint pain and gave him a mouth guard. He states that the mouth guard has worked for the past 3 years and this is the first time that the mouth guard has not helped to alleviate his symptoms. His pain has been so bad for the previous 8 days that he has not been able to eat or drink anything secondary to the pain. He has been taking ibuprofen approximately 1 pill three times a day which has not helped.

AR 511. On November 14, 2012, Plaintiff told physicians who were consulting with Dr.

Blanchard that:

[H]e had been experiencing right ear and jaw pain for the last 3 years. He describes the pain as shock[-]like pain affecting his right ear, jaw and neck triggered by swallowing, chewing, [and] anxiety. He was seen by [an] ENT specialist three years ago and according to [the] patient, his exam was normal at that time. He was seen by his dentist and he was diagnosed with temporomandibular [ ] joint pain and was advised to use some mouth guard that apparently helped with his symptoms until two weeks ago [when] the pain became more severe.

AR 387. The physicians' report continued, "We understand the patient was started on

carbamazepine and since he was started on medication he had noticed improvement of pain."

AR 388. Again, these statements were made over three days to different physicians at UNMH,

and they are generally consistent.

On November 30, 2012, Plaintiff went to the ER at Lovelace Hospital because of his ear

and facial pain and reported that "[t]he onset of the presenting problem started 4 week(s) ago."

AR 682. This statement is also consistent with the timeline Plaintiff related to the UNMH

physicians. It therefore strains credulity for Plaintiff to now insist that *all* of these statements

were inaccurate because he was so impaired by his pain and insomnia that he had understanding

and memory limitations that caused him to give *all* of these inaccurate statements to so many

different physicians over different days. For these reasons, the ALJ did not err by failing to credit statements Plaintiff gave to his physicians that showed that he suffered from memory limitations, and her credibility determination that Plaintiff was only partially credible is intact. *See* Pl.'s Mot. 13-14.

Because the medical records are all consistent with each other, the Court also rejects Plaintiff's argument that the ALJ was required to identify "any statements [Plaintiff] gave to his doctors which demonstrated he indeed suffered from memory limitations[.]" It was Plaintiff's burden to prove that he was disabled as of the onset date he alleged at steps one through four, not the ALJ's burden to identify statements proving that Plaintiff has memory limitations. *See Bowen*, 482 U.S. at 146; *Talbot*, 814 F.2d at 1460.

### 2. The ALJ did not err in her evaluation of Plaintiff's and his family's statements.

Plaintiff argues that SSR 16-3p required the ALJ to not grant lesser weight to the pre-February 3, 2014, reports of Plaintiff and his family. *Id.* at 19. Plaintiff contends as well that the ALJ did not comply with SSR 16-3p in evaluating Plaintiff's alleged asymptomatic time periods. *Id.* at 16-19. Plaintiff also alleges that the ALJ erred by rejecting Plaintiff's testimony and his witnesses' statements "supporting his disabling pre-DLI condition." *Id.* at 22.

The Commissioner responds that the ALJ reasonably evaluated the evidence, taking into account Plaintiff's statements, his record of treatment, and his family's statements. Def.'s Resp. 21. The Commissioner also argues that SSR 06-03p is the applicable SSR for evaluating the statements of Plaintiff's family, not SSR 16-3p, and further asserts that the ALJ complied with it in evaluating Plaintiff's statements and those of his family. *Id.* at 20-21.

SSR 16-3p is relevant to Plaintiff's arguments, because it discusses how the ALJ is to evaluate evidence in the record to reach a conclusion about "the intensity, persistence, and

limiting effects of an individual's symptoms." SSR 16-3p, 2017 WL 5180304, at *4 (Oct. 25, 2017).[23] In addition to objective medical evidence, the ALJ should also consider "statements from the individual, medical sources, and any other sources that might have information about the individual's symptoms, including agency personnel[.]" *Id.* at *6. Other sources include the plaintiff's family and friends, and "[t]he adjudicator will consider any personal observations of the individual in terms of how consistent those observations are with the individual's statements about his or her symptoms as well as with all of the evidence in the file." *Id.* at *7.

SSR 06-3p, which was rescinded by the SSA shortly after the ALJ's decision in this case, is consistent with SSR 16-3p in terms of how an ALJ is to evaluate information from a non-medical source like Plaintiff's family. It states that an ALJ may consider how long the source has known the plaintiff and how frequently the source has seen the plaintiff, how consistent the opinion is with other evidence, the degree to which the source presents relevant evidence to support an opinion, how well the source explains the opinion, whether the source has a specialty or area of expertise related to the plaintiff's impairment, and any other factors that tend to support or refute the opinion. SSR 06-03p, 2006 WL 2329939, at *4-5 (Aug. 9, 2006).

The ALJ complied with both SSR 06-03p and SSR 16-3p in granting some weight to the statements of Plaintiff's brother and his parents. AR 20-21. She recognized that the witnesses:

> [A]re familiar with [Plaintiff] and well positioned to provide information about his abilities and limitations. These opinions are consistent with the testimony of [Plaintiff] in that the witnesses endorsed significantly limited physical and mental [ ] activities. Lesser weight was given to these statements for the period prior to February 3, 2014[,] as they are slightly out of proportion with the limited [ ] and conservative medical treatment evidence . . . [t]he opinions are more persuasive for the period since the established onset date of disability.

---

[23] SSR 16-3p was originally published on March 24, 2016, prior to the date of the ALJ's decision in this case. The 2017 version to which the Court cites made non-substantive changes that did not change the quoted portion in this opinion.

AR 20-21. This analysis hews closely to the mandates of SSR 06-03p and SSR 16-3p. Because it faithfully does so, and because the Court may not re-weigh evidence, the Court finds no error in the ALJ's evaluation of these third party statements.

Plaintiff also argues that the ALJ ignored his and his brother's statements that he was suicidal as early as 2009, which meant the ALJ erred in determining that the disability onset date was several years later in 2014. Pl.'s Mot. 14-15. The Commissioner responds that Plaintiff's statements and his brother's alone do not establish disability, citing 20 C.F.R. § 404.1529(a) (2011)[24] ("However, statements about your pain or other symptoms will not alone establish that you are disabled[.]"). Def.'s Resp. 18. The Commissioner also argues that the record does not support Plaintiff's allegations that he attempted suicide. *Id.*

Plaintiff appears to conflate a condition's severity with whether it is disabling. It is possible for an individual to suffer from severe mental health issues but still not be disabled from them. There is no disagreement that Plaintiff was suicidal and thought about suicide daily. *See* AR 637-38 (Dr. Anderson's 2015 evaluation noting that Plaintiff was suicidal daily); AR 657 (Dr. LaCourt's 2016 evaluation also noting that Plaintiff was suicidal daily). Plaintiff denied self-harm and suicide attempts to both Dr. Anderson [AR 637] and Dr. LaCourt [AR 657]. Plaintiff now characterizes two previous incidents of food poisoning as suicide attempts because he purposefully drank orange juice that he had purposefully left unrefrigerated so it would make him sick. Pl.'s Mot. 4; Pl.'s Reply 1, ECF No. 25; *see* AR 689 (describing Plaintiff's ER visit on December 20, 2009, as related to acute gastrointestinal symptoms, and also describing Plaintiff's mood and affect as normal); AR 665-66 (describing Plaintiff's ER visit on November 30, 2014, as food poisoning related to a bad hamburger, characterized by persistent, severe vomiting, and stating that Plaintiff had normal mood, effect, and cognition).

---

[24] This regulation was amended on March 26, 2017; this is the version in effect at the time of the ALJ's decision.

Both of Plaintiff's affidavits and his brother's affidavit state that Plaintiff was suicidal, and that he had been suicidal since 2009, but do not state that he had attempted suicide. AR 771, 775, 807-09. Even if Plaintiff had attempted suicide, Plaintiff has never been diagnosed with a mental health condition by a treating source and has never sought out mental health care. *See* AR 637. It is unclear how, in the absence of any treatment, the ALJ could have found that Plaintiff's suicidal ideation was disabling. The ALJ did not err in her evaluation of Plaintiff's and his brother's statements concerning Plaintiff's suicidal ideation.

**B.     The VE's Testimony Was Supported by Substantial Evidence**

The Court construes Plaintiff's argument to be that the ALJ erred by not including Plaintiff's impairments of chronic mental fatigue, sleep disorder, and insomnia in the hypothetical questions she posed to the VE, because if she had, the ALJ would have selected an earlier disability onset date. Pl.'s Mot. 18. In this case, the VE was given an inclusive hypothetical:

> Now, please consider an individual that can lift, carry, push and pull ten pounds occasionally, five pounds frequently, could stand and/or walk for two hours, sit for six hours in an eight-hour day. All the other restrictions remain in effect. [This individual can never balance, can never climb ladders, ropes or scaffolds. Should avoid exposure to unprotected heights, hazardous machinery. [AR 66]] Additionally, this individual is limited to work that is primarily performed at the work station. When I said the other restrictions remain in effect, actually, I'm going to change reaching, handling, fingering[,] and feeling to occasional. And, I'm going to add another restriction that the individual may require frequent, unscheduled breaks each day. Would there be any jobs within that hypothetical?

AR 67-68. The VE testified that inability to frequently reach, handle, and finger, plus the need to take frequent, unscheduled breaks in addition to regular breaks, would disqualify Plaintiff from employment. AR 68. The VE testified that the need for frequent, unscheduled breaks each day would eliminate the jobs the VE identified for that hypothetical residual functional capacity. AR 68. The ALJ wrote that ultimately what rendered Plaintiff disabled was his need for

frequent, unscheduled breaks due to his pain. AR 21. Even if the ALJ had included the information Plaintiff wanted her to include in the hypothetical for the VE, none of that would have changed the VE's testimony. The Court therefore concludes that the VE's testimony was supported by substantial evidence.

### C.     The AC Did Not Err by Refusing to Consider Plaintiff's Additional Evidence

Plaintiff argues that the AC erred by not reviewing evidence he submitted to it after the hearing, which included his and his brother's affidavits, as well as his letters to N. Phoenix Anderson, Ph.D., and David LaCourt, Ph.D. Pl.'s Mot. 24; AR 2. Plaintiff also asserts that the AC erred by not requesting that a professional review that evidence. Pl.'s Mot. 24. The AC found that the evidence did not "show a reasonable probability that it would change the outcome of the decision[,]" and therefore "did not consider and exhibit this evidence." AR 2. The Commissioner argues that the AC reviews additional evidence if "there is a reasonable probability that the additional evidence would change the outcome of the decision." Def.'s Resp. 22 (citing 20 C.F.R. § 404.970(a)(5) (2017) ("The [AC] will review a case if . . . the [AC] receives additional evidence that is new, material, and relates to the period on or before the date of the hearing decision, and there is a reasonable probability that the additional evidence would change the outcome of the decision."). The Commissioner asserts that Plaintiff "has not shown that his [AC] evidence had a reasonable probability of changing the outcome." *Id.* Plaintiff's evidence focused on his alleged suicide attempts. *Id.*

The Court agrees with the Commissioner that Plaintiff has not shown that this evidence would change the outcome of the ALJ's decision. As explained *supra* at 40-41, the record is unsupportive of Plaintiff's allegations that the food poisoning incidents were actually suicide attempts, and the psychological consultative examinations confirmed that Plaintiff had never

attempted suicide. Plaintiff asserts that he was too fearful to tell the psychological CEs that he had attempted suicide, even though he had already endorsed suicidal ideation. *See* Def.'s Resp. 23. Again, even if Plaintiff had attempted suicide, Plaintiff has never been diagnosed with a mental health condition by a treating source and has never sought out mental health care. *See* AR 637. Because the evidence Plaintiff submitted to the AC would not have changed the outcome, the Court concludes that the AC did not err in refusing to consider it. Because the evidence was not considered and was not otherwise admitted, the SSA was not required to include it in the record. *See* Pl.'s Mot. 25.

**VI.    CONCLUSION**

For the foregoing reasons, the Court holds that the ALJ's decision was supported by substantial evidence and the correct legal standards were applied.

**IT IS THEREFORE ORDERED** that Plaintiff's Motion to Reverse and Remand for a Rehearing with Supporting Memorandum [ECF Nos. 16 and 17] is **DENIED.**

**IT IS FURTHER ORDERED** that the Commissioner's final decision is **AFFIRMED** and that the instant cause is **DISMISSED.**

**IT IS SO ORDERED.**

THE HONORABLE GREGORY J. FOURATT
UNITED STATES MAGISTRATE JUDGE
***Presiding by Consent***